Filed 1/10/23 HayDx v. Ichida CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| HAYDX, INC., | |
| Plaintiff and Appellant, | E076124 |
| v. | (Super.Ct.No. PSC1800056) |
| LYNDON ICHIDA. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. Irma Poole Asberry, Judge. Affirmed.

Snell & Wilmer, Jason T. Yu, and Jing (Jenny) Hua, Andrew M. Jacobs for Plaintiff and Appellant.

Ferrari Law and Charles D. Ferrari for Defendants and Respondents.

After a bench trial in this business contract case, the trial court found that the seller was not liable to the purchaser for conversion of hay-baling machinery and a fleet of trucks. The purchaser argues on appeal that this finding was erroneous. We interpret the

contracts and conclude that the seller did not transfer this equipment to the purchaser, so there was no conversion. We therefore affirm the judgment.

BACKGROUND

The parties to this appeal had a series of contracts for sale of a business, but their relationship soured and this litigation began. The sellers were defendants and respondents Hayday Farms, Inc. (Hayday) and Lyndon Ichida. Hayday is "a Southern California corporation that grows, processes, sells and purchases hay and alfalfa." Ichida is Hayday's president. The purchaser was plaintiff and appellant HayDx, Inc. (HDX), a California corporation, formed by an investor for entering into the transaction here.

Hayday owns a property in Blythe, California, where it "compresse[d] forage crops for export to Asian markets." Hayday and HDX entered into an Asset Purchase Agreement (APA) regarding that "Business." The trial court found, echoing the phrasing of an expert who testified at trial, that the business "was a turnkey operation," and that the intent of the parties was for HDX to "acquire[] a going concern, the inventory, equipment, customers, vendors, employees, government licenses and permits, and use of the land." The APA provided for HDX to take over the business from Hayday by, among other things, purchasing (with certain express exclusions) "[a]ll machinery, equipment, tools, vehicles . . . and other tangible physical property that are used or useful in the Business and owned by Seller or located at the Blythe Property." The purchased property included, but was not limited to, items listed or described in Exhibit C to the agreement.

2

The APA was backdated to June 3, 2014, though it was actually signed later that month, and parts of it—in particular its Exhibit C—continued to evolve during an escrow process of sorts, as the parties specifically identified what assets were used or useful in the business and thus were to be transferred to HDX on closing. The APA contemplated that on closing the purchased assets were to be transferred to HDX "free and clear of any and all Liens," except that HDX would "assume and agree to perform and discharge" certain liabilities totaling $2,238,378.73 that were secured by items listed in Schedule 2.8 to the APA.[1] HDX was also required under the APA to pay Hayday $3 million.

Two types of assets listed in Schedule 2.8 are at issue. The first, referred to by the parties as "the Hunterwood Press," is a "particularly valuable piece of equipment used to bale alfalfa," which secured a debt of $1,205,301.57.[2] The second is a set of 13 trucks powered by liquified natural gas (LNG trucks), which secured a debt of $477,762.16.[3]

In late August 2014, HDX paid Hayday the $3 million contemplated by the APA. It did not, however, formally assume the debts secured by the Hunterwood Press or the LNG trucks, or even contact the lenders about the possibility of assuming them. The

---

[1] In addition to the APA, the parties also entered into a separate "Supplemental Agreement to Asset Purchase Agreement (SAAPA). The most relevant provisions of the SAAPA, however, were incorporated into the final version of the APA. The parties apparently agree, therefore, that the SAAPA is not crucial to our analysis.

[2] The Hunterwood Press was initially purchased by Hayday for approximately $2.1 million and had an estimated market value in 2014 of $1.8 million.

[3] The fleet had been a set of 15 LNG trucks, but two were destroyed in accidents. The parties estimated the trucks' market value in 2014 at between $60,000 and $90,000 each, depreciated from an initial purchase price of $137,767 each.

3

parties either discovered or assumed that the lenders for the Hunterwood Press and the LNG trucks would not agree to formal transfer of title in those items and assignment of the debt they secured from Hayday to HDX, and also (unlike some other lenders listed on Schedule 2.8 of the APA) would not accept a less formal arrangement whereby HDX simply paid loan invoices issued to Hayday. Thus, by September 2014, it became apparent to all involved that Hayday would not be able to fulfill the APA's condition requiring transfer of "all title to and rights and interest" in the purchased property until the debts the Hunterwood Press and LNG trucks secured were paid in their entirety.[4] Under the terms of the APA, therefore, absent a written waiver, the transaction could not close.[5]

---

[4] The conditions on closing included not only a general "instrument of conveyance," but also "such other . . . assignments, consents and other good and sufficient instruments of conveyance . . .to convey to and vest in [HDX] all title to and rights and interest in the Purchased Assets in accordance with the terms of this agreement," as well as an "assignment and assumption instrument with respect to the Assumed Liabilities . . . ." Although such documents are listed as "deliveries" to be made by Hayday, HDX was also required to deliver documents "as [Hayday] may reasonably and timely request . . . to consummate more effectively the transactions contemplated by this Agreement *or in order to evidence the compliance by [HDX] with any obligation in this Agreement*." (Italics added.) Thus, because the lenders who held a security interest in the Hunterwood Press and the LNG trucks were not on board, neither Hayday nor HDX could satisfy the closing conditions.

[5] The APA provided that "[t]he Closing shall not occur unless and until all of the [enumerated] actions and conditions . . . shall have been taken (or waived)." It further provided that "any provision" of the agreement could be amended or waived, "but only in a writing signed by the party against whom such amendment or waiver is sought to be enforced."

In September 2014, apparently to break through this impasse and proceed with the sale of the business, Hayday and HDX entered into a series of lease agreements regarding the Hunterwood Press and the LNG trucks.[6] The lease agreements provide for the leased items to remain the "sole property" of Hayday, and that the "Lessee shall have no property interest therein, but only the right to use the Equipment" during the term of the lease. The lessee is responsible for all operating costs, fuel, labor, maintenance, and taxes on the leased items during the lease term, and required to obtain insurance. The lease agreements specify that at the end of the lease (one year, renewing automatically unless terminated on prior notice), the equipment is to be returned to Hayday "complete and in good condition, reasonable wear excepted." The lease agreements do not specify payments owed, referring instead to a separate schedule that, at least in the copies in our record, were left blank. There is evidence, however, that the parties' understanding was that HDX was to make payments to Hayday in the amounts due on the loans secured by the leased property.

At some point in 2014, HDX took possession of the Blythe property and began operating the business, including using the Hunterwood Press and the LNG trucks.[7] HDX made some payments on the loans described in Schedule 2.8 of the APA, including

---

[6] More precisely, the lease agreements for the Hunterwood Press were between Hayday and HDX, but the lease for the LNG trucks was between Hayday and HayDX Logistics, Inc., another of several entities created along with HDX to purchase and operate the business. HayDX Logistics, Inc. is not a party to this case.

[7] It is difficult to establish a precise date from the record, but it was at some point after late August, when HDX made the $3 million payment.

some directly to Hayday for the loans secured by the Hunterwood Press and the LNG trucks. But it did not finish paying down the balance owed on the Hunterwood Press and the LNG trucks. By December 2016, HDX ceased operation of the business and began liquidating its assets, and it made no more payments to Hayday.

In 2018, Hayday sold the Hunterwood Press to a third party for $1.5 million, despite HDX's ownership claims.[8] Hayday retained possession of the LNG trucks.

HDX brought suit against Hayday in January 2018, alleging causes of action for breach of contract, fraud, and conversion. In September 2020, after a bench trial, the trial court found in favor of the defendants on all three claims, and further found that defendants were entitled to an award of contractual attorney fees as the prevailing party. HDX now appeals, challenging the judgment only as to conversion, as well as the attorney fee award.

## DISCUSSION

HDX's conversion claim rests on the premise that HDX has "legal ownership and the right to possess" the Hunterwood press and the LNG trucks.[9] The trial court rejected

---

[8] Hayday attempted to sell the Hunterwood Press in August 2017, but that sale was disrupted by a "UCC1 notice of lien or ownership" filed by HDX. The transaction was ultimately completed in 2018.

[9] As HDX notes, a conversion claim does not necessarily require clear legal title or even ownership rights in the items; interference with a right of possession can be enough. (See *Hartford Financial Corp. v. Burns* (1979) 96 Cal.App.3d 591, 598.) HDX has not asserted, however, that Hayday ever interfered with its right of possession when HDX did not own the equipment and had only a right of possession. Rather, HDX argues that it has owned the Hunterwood Press and the LNG trucks since the parties entered into the APA. Our analysis here, therefore, focuses on ownership.

6

that premise, finding in its statement of decision that HDX "does not have ownership rights" in either, and thus defendants did not "retain[] any property in a manner inconsistent with [HDX's] property rights." We agree with the trial court's conclusion.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240 [cleaned up].)

The question of whether HDX owned the Hunterwood Press and the LNG trucks turns on interpretation of the parties' contracts, as applied to facts that are undisputed in any relevant respect. We therefore review the judgment de novo. (See *The Fifth Day, LLC v. Bolotin* (2009) 172 Cal.App.4th 939, 946 ["Contract interpretation on undisputed facts is a question of law that we review de novo"].) "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting." (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1009 [cleaned up].) "'When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible.'" (*Ibid.*)

The parties' several written contracts are not, to say the least, a model of clarity. Taken together, however, and placed in the context of undisputed facts, they are fairly straightforward to interpret. The APA provided that the transaction could not close until "all title to and rights and interest" in the "Purchased Assets" was transferred from

7

Hayday to HDX. By means of the equipment leases, the parties modified that provision, allowing the transaction to close even though, as to the Hunterwood Press and LNG trucks, only the right of possession during the lease term had been transferred to HDX.[10] The parties mutually anticipated that formal title to that equipment would be transferred to HDX at a later date—either once the secured debts were paid off, or once the lenders could later be persuaded to allow HDX to take title and assume the remaining debts, although that meeting of the minds was not reduced to writing. In the meantime, however, the lease agreements provided that the Hunterwood Press and LNG trucks remained the "sole property" of Hayday. Since HDX did not pay lease payments through the time that the debts were paid off, and since it never obtained the lenders' agreement to a transfer of ownership and assumption of the debts, the Hunterwood Press and LNG trucks remained Hayday's sole property.

---

[10] Whether the lease agreements strictly comply with the APA's provision that *it* be modified only in writing is perhaps arguable, since the lease agreements, though in writing and between the same parties, do not expressly reference the APA. But the alternative conclusion would be that the transaction described in the APA *never* closed, since the APA's stated conditions for closing were never met. Such an interpretation would be inconsistent with the parties' mutual intent, as demonstrated by (among other things) their behavior both during and after the period when HDX operated the business. (E.g., *Crawford v. Continental Cas. Co.* (1968) 261 Cal.App.2d 98, 102 ["It is well settled that although an agreement may be indefinite or uncertain in its inception, the subsequent performance of the parties will be considered in determining its meaning for they are least likely to be mistaken as to the intent"].) In any event, even the APA's provision requiring amendments or waivers to be in writing is subject to waiver. (See *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [despite contract provision requiring amendments to be in writing, "'the parties may, by their conduct, waive such a provision' where evidence shows that was their intent"].)

HDX's alternative interpretation is that all ownership rights in the Hunterwood Press and the LNG trucks passed from Hayday to HDX once the August 2014 $3 million payment to Hayday was made, or perhaps as soon as the APA was signed. In HDX's view, therefore, the lease agreements could not reserve for Hayday sole ownership in the Hunterwood Press and the LNG trucks. According to HDX, the earlier APA (and SAAPA) meant that Hayday no longer had any interest in that equipment to convey to HDX, no matter what the lease agreements said, and no matter what the equipment's title documents said. This interpretation, however, is incompatible with the parties' written agreements, including not only the lease agreements, but also the APA itself. As noted, the APA does not state that the transaction went into effect upon signing, or even upon payment of $3 million to Hayday. Rather, the APA had specific conditions to closing that the parties had to address—either by satisfying those conditions (which did not happen) or by modifying them in writing (which did)—for the closing to take place.[11]

---

[11] In light of HDX's thoughtful, but ultimately unpersuasive oral argument, it bears emphasizing that HDX's $3 million payment under the APA was not just for an ownership interest in the Hunterwood Press and the LNG trucks, but for the entirety of the active business that Hayday had previously owned and operated. The lease agreements modified the APA's specific provisions regarding when an ownership interest in that equipment—a part of that business, but only a part—would pass from Hayday to HDX, and who would be responsible in the immediate future for the debts secured by that equipment, at least from the lenders' perspectives. But ultimately the lease agreements would not have changed the underlying economics of the transaction contemplated by the APA, had HDX made its payments; HDX would eventually have paid down the secured debts, either indirectly by payments relayed through Hayday or by payments directly to the banks, and it would have received title to the equipment when those payments were completed.

9

We decline to discuss in any detail HDX's argument that Hayday is "estopped to deny that [HDX] acquired whatever rights Hayday had" in the Hunterwood Press and the LNG trucks, since it accepted the $3 million August 2014 payment. First, the argument is forfeited, as it is raised in passing, in a single, conclusory sentence, supported only by cryptic citation to apparently inapposite authority. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate briefs must ["[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 ["Each point in an appellate brief should appear under a separate heading, and we need not address contentions not properly briefed."].) In any case, even if not forfeited, the argument lacks merit. We are unaware of any authority that might support the conclusion that HDX's *partial* performance of its obligations under the APA could estop Hayday from taking the position that HDX had failed to perform *other* obligations under the APA (as well as the parties' other agreements), which were prerequisites to HDX acquiring ownership rights in the Hunterwood Press and LNG trucks.

We are not persuaded that HDX currently has any interest in the Hunterwood Press or the LNG trucks, let alone the ownership interest that it claims. HDX thus fails to establish even the first element of its conversion claim. The trial court was correct to enter judgment in the defendants' favor as to the conversion cause of action and, accordingly, as to attorneys' fees.

10

DISPOSITION

The judgment is affirmed.  Hayday and Ichida are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL            
J.

We concur:

MILLER         
             Acting P. J.

SLOUGH         
             J.